**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ROBERT JOE POINDEXTER, | ) | |
| | ) | |
| Debtor. | ) | Case No. 05-30410 |
| | ) | |
| ROBERT JOE POINDEXTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 07-3014 |
| | ) | |
| SOUTHWEST MISSOURI BANK, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This adversary proceeding raises the question of how far a creditor may go to obtain repayment on a debt without running afoul of the discharge injunction of 11 U.S.C. § 524 when the debtor has expressed his intention – both before and after filing bankruptcy – to repay the debt but never entered into a reaffirmation agreement. Expressed another way: "When is the voluntary repayment of a discharged debt no longer voluntary?"

For the reasons stated below, the Court finds that the creditor in this case, Southwest Missouri Bank ("SMB"), stepped over the injunctive "line" in its efforts to obtain the repayment of a debt and, in fact, did so in willful violation of the discharge injunction, thereby entitling the Debtor to an award of actual damages, punitive damages, and attorney's fees and costs.

**FACTUAL BACKGROUND**

The Debtor, Robert Joe Poindexter ("Debtor" or "Poindexter"), filed for protection under chapter 7 of the Bankruptcy Code on March 30, 2005. As of the petition date, the Debtor was indebted to SMB under a note dated March 6, 2005 ("Old Note") with a balance of $72,523.99. The Old Note was at least partially secured by cattle, machinery, equipment, and vehicles. The Debtor indicated on his "Statement of Intention" that he intended to reaffirm this debt to SMB, but no reaffirmation agreement was ever executed or filed by the parties or approved by the Court, although

it appears that attorneys for SMB might have prepared one.

The discharge was entered on July 14, 2005; however, Poindexter continued to make payments on the Old Note because he wanted to retain the collateral securing it.

When the Old Note matured on March 6, 2006, the Debtor met with John Young ("Young"), a senior vice president of SMB who worked on the Debtor's loans, to discuss how he could continue to repay his indebtedness to SMB. One of Poindexter's concerns was that he wanted to receive monthly payment notices from the bank so that he could keep track of the amount he owed. Young proposed that the Debtor execute a new note which would enable SMB to send Poindexter computer-generated monthly reminder notices and to automatically credit the payments received from the Debtor to the debt. Otherwise, Young testified, notices and payments would have to be processed manually after the Old Note matured. The new note, dated March 6, 2006 ("New Note") was secured by the same collateral and the same security agreement as the Old Note.

After making just three payments on the New Note, the Debtor on July 21, 2006 suffered a severe brain-stem stroke which hospitalized him for five days. Miraculously, he did not suffer disabling brain damage, but his doctors told Poindexter that another such stroke would almost certainly be fatal and that he should get his affairs in order. Faced with this ominous prognosis, the Debtor asked his son and daughter, Robert Shane Poindexter ("Shane") and Robyn L. Lemere ("Robyn"), to make sure that he remained in good standing with SMB by getting a forbearance or working out some other arrangement. To facilitate this, the Debtor on July 26, 2006 signed a one-sentence, handwritten statement authorizing Shane and Robyn to obtain information from the bank about his loans.

Armed with this letter, Robyn and Shane met with Young to discuss their father's situation. After meeting with Young, Robyn and Shane reported to their father that he might be "in trouble" with SMB over some missing collateral and that they needed power of attorney over his affairs to resolve the problem.

On August 4, 2006, the Debtor executed a power of attorney giving Shane and Robyn authority to manage the Debtor's financial affairs. That document was recorded on August 7. Shortly thereafter, on August 10, Shane and Robyn executed, on behalf of the Debtor, a deed of trust ("Deed of Trust") on the Debtor's home in favor of SMB. Apparently, between the time Robyn and Shane first met with Young and August 10, Robyn, Shane, and Young went to inspect the Debtor's

home to determine the feasibility of remodeling it for purposes of refinancing or sale. Young brought along a contractor, Mr. Lyman, who was knowledgeable about remodeling and had an interest in buying the property himself. Mr. Lyman did not buy the property, but he did facilitate its sale to some people he knew, Douglas and Michelle Sanders. Young suggested that Robyn and Shane execute the deed of trust because he believed it would be the "easiest" way for SMB to receive the proceeds of the sale after the first mortgage was paid off. At trial, however, Young admitted that it would have been just as easy, if not easier, to simply direct the title company to cut SMB a check from the proceeds.

The sale of Poindexter's home closed on August 28, 2006. Out of the $80,000 in proceeds from the sale, $43,280.69 went to pay off the first mortgage, $543.36 went to pay taxes and closing costs, and the rest – $36,175.95 – went directly to SMB. The Debtor did not receive anything from the sale.

On or about October 13, 2006, the Debtor requested that SMB turn over the money it had received from the sale of his home. The bank refused, and this adversary proceeding followed.

## DISCUSSION

The discharge injunction of 11 U.S.C. § 524 is one of the most fundamental protections, or "benefits," of bankruptcy. Without it, there would be no "fresh start." Specifically, § 524 enjoins "the commencement or continuation of an action, employment of process, or an act, to collect, recover or offset any such [discharged] debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2). Put simply, § 524 prevents creditors from taking actions to collect debts that have been discharged in bankruptcy.

A creditor seeking to escape the strictures of § 524 has two options (and the second one is usually ephemeral, at best). It can obtain the debtor's "reaffirmation" of the debt under § 524(c), which requires extensive disclosures and court approval among other things, or the creditor can simply hope that the debtor voluntarily repays the debt.[1]

In this case, the Debtor never reaffirmed his debt to SMB. The evidence indicates that both

---

[1] *See* 11 U.S.C. § 524(f) ("Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt."). Nothing is subsection (a) or (b) prevents voluntary repayment, either.

3

he and SMB intended to execute and file a reaffirmation agreement with the Court, but for some reason it was never done. Consequently, the only way SMB could be paid on the Old Note was to rely on the Debtor's voluntary repayment, plus repossession and sale of the remaining collateral.

A debtor's repayment of a discharged debt will be considered "voluntary" if it is free from creditor influence or inducement.[2] Repayment cannot be the result of pressure or other inducement by a sophisticated creditor.[3] And the creditor's belief that the debtor's payment is voluntary must be reasonable.[4] In short, a debtor's payments on a discharged debt are to be regarded as voluntary where the creditor's only action is simply to accept the debtor's payments.[5]

Here, the Court might have found that the Debtor's post-discharge payments to SMB were voluntary if the *only* thing SMB did was to create a new note for the *sole* purpose of facilitating the Debtor's voluntary repayment of his debt to SMB, but that wasn't the only action SMB took to "accept" payments from the Debtor. Nor does the Court believe that the New Note or the Deed of Trust was created for strictly administrative convenience.

First, the Court questions whether the New Note even served the purpose for which it was allegedly created. According to Young and the Debtor's testimony, the New Note was created to enable the Debtor to receive monthly notices so he wouldn't have to call each month to find out how much was due. But Young's deposition testimony and the evidence adduced at trial suggest that only past-due notices would have been sent. So the need for the New Note is suspect from the outset.

Second, SMB did much more than simply *accept* payments from the Debtor; it took several affirmative actions to *obtain* payment of the discharged debt. It prepared and had the Debtor sign a new note that effectively reaffirmed a discharged debt without compliance with the statutory provisions pertaining to reaffirmation agreements. It took an active role in the sale of the Debtor's home, including bringing in a contractor who was familiar with remodeling costs and had some

---

[2] *In re Hudson*, 168 B.R. 368, 371 (Bankr. S.D. Ill. 1994).

[3] *In re Caravona*, 347 B.R. 259, 268 (Bankr. N.D. Ohio 2006).

[4] *In re Wiley*, 224 B.R. 58, 72 (Bankr. N.D. Ill. 1998) vacated on different grounds by 237 B.R. 677 (Bankr. N.D. Ill. 1999).

[5] *Id.*

interest in buying the property. That sale yielded absolutely no benefit to the Debtor other than the partial repayment of a previously discharged debt. And it used its influence to obtain a deed of trust on the Debtor's home – a deed of trust that the bank prepared – thereby *requiring* payment of the net sale proceeds to SMB. The Court does not believe Young's trial testimony that the bank would have released the deed of trust if Poindexter had changed his mind and refused to pay the net sales proceeds over to SMB. Voluntary relinquishment of collateral and secured positions is a concept foreign to most banks. The mere existence of the deed of trust rendered the repayment less than wholly voluntary, making it more difficult for the Debtor to back out, even if it didn't prevent him from doing so altogether. As noted above, a "voluntary" repayment of a discharged debt cannot be the result of pressure or other inducement by a sophisticated creditor.

Third, the evidence belies SMB's position that it believed that the payments were voluntary. Young's deposition testimony is particularly damning in this regard. At his deposition he stated (at least five times) that he believed that the Debtor was personally liable on the New Note. He also testified that SMB could pursue the Debtor for any deficiency if SMB ever had to foreclose on the collateral securing the note. Young's attempt at trial to diffuse this testimony was not persuasive. Essentially, Young's testimony and SMB's actions reflected SMB's belief that the Debtor had reaffirmed the debt. But he hadn't, and the Court cannot condone conduct that subverts the necessary disclosures and court review required under § 524 for reaffirmation agreements.

Finally, the fact that the Debtor was incapacitated and did not participate directly (or at all) in the sale of his home to pay down the debt to SMB militates heavily against a finding that his repayment was voluntary. This is not to say that a debtor's repayment of a discharged debt could never be accomplished through a debtor's legal proxy, such as a legal guardian or, as in this case, the Debtor's two attorneys-in-fact, but in such situations the circumstances surrounding repayment would have to be closely scrutinized; SMB's actions here fail to withstand that scrutiny.

When SMB, through its loan officer, Young, learned that it did not have a Court-approved reaffirmation agreement with the Debtor, it should have proceeded cautiously in its dealings with the Debtor. And when the Debtor suffered a stroke and could no longer carry on his own affairs, SMB should have ratcheted up that caution. Instead, SMB used the Debtor's previously stated interest in repaying his debt to SMB as *carte blanche* to actively, and, quite frankly, aggressively pursue the collection of that debt by hastening the sale of the Debtor's home and by obtaining an

invalid deed of trust on the home that insured the direct payment of the proceeds to SMB.

*Actual Damages*

Section 524 does not contain any provision comparable to 11 U.S.C. §362(k), which authorizes an award of damages to a debtor for a willful violation of the automatic stay. Instead, willful violations of the discharge injunction are punishable by contempt.[6] A creditor found in contempt for having willfully violated the discharge injunction is subject to an award of actual damages including attorney fees.[7] The standard of willfulness, similar to that set forth in §362(k), requires evidence the offending creditor knew of the existence of the discharge order and intentionally took actions which violated its provisions.[8] Knowledge of the order and willful violation must be established by clear and convincing evidence.[9]

Here, there is clear and convincing evidence that SMB knew of the discharge order and that SMB intentionally took actions in violation of its provisions. Young testified at the hearing that he received the discharge order and that that was what led him to investigate whether a reaffirmation agreement with the Debtor had been filed. When he found out that no reaffirmation agreement had been filed, he took steps to (in his words) "facilitate" the Debtor's repayment. Because those steps violated of the discharge order, SMB's violation of the discharge order was intentional and done with full knowledge of the discharge order. Therefore, the Court will award the Debtor his actual damages, consisting of $36,175.95, plus interest at the statutory rate[10] from August 28, 2006, and the attorney's fees and expenses incurred in recovering that money, which total $5,255, including three hours of trial time at $175 an hour.

*Punitive Damages*

---

[6] *In re Perviz*, 302 B.R. 357, 370 (Bankr. N.D. Ohio 2003); *In re Goodfellow*, 298 B.R. 358, 361 (Bankr. N.D. Iowa 2003).

[7] *Perviz*, 302 B.R. at 370; *Goodfellow*, 298 B.R. at 362.

[8] *Perviz*, 302 B.R. at 370.

[9] *Goodfellow*, 298 B.R. at 362; *Koehler v. Grant*, 213 B.R. 567, 570 (B.A.P. 8th Cir. 1997).

[10] *See* 28 U.S.C. § 1961.

Although there is some doubt as to whether a debtor may seek "punitive damages" for egregious violations of the discharge injunction,[11] there is no doubt in this jurisdiction that, upon proper notice,[12] a bankruptcy court has the inherent power to sanction vexatious conduct presented before the court,[13] including the power of criminal contempt.[14] Because the arguably vexatious conduct here involves a violation of the discharge injunction, the Court will apply the standards used by the courts which have imposed punitive damages for violations of the discharge injunction. That is, an award of punitive damages is appropriate for a creditor's violation of the discharge injunction where the violation of the injunction was done with either "malevolent intent or a clear disregard and disrespect of the bankruptcy laws."[15]

There is no evidence that SMB acted with malevolent intent; however, upon careful consideration of the facts in this case, the Court does believe that SMB acted with a clear disregard and disrespect of the bankruptcy laws. Numerous factors have led to this conclusion. Although the Debtor had expressed his intent to reaffirm his pre-bankruptcy debt and had actually made several voluntary payments on the debt post-discharge, no reaffirmation agreement was ever entered into between Poindexter and the bank. In that circumstance, the most SMB could do was to (a) foreclose on the remaining collateral and (b) accept whatever voluntary payments Poindexter chose to make on the unpaid balance. Young, the bank's officer, knew that a reaffirmation agreement was required for reaffirmation of the debt, and he knew when he received notice of the Debtor's discharge that

---

[11] *Compare In re Watkins*, 240 B.R. 668 (Bankr. E.D. N.Y.) (holding that punitive damages are available for violations of the discharge injunction); *In re Vazquez*, 221 B.R. 222 (Bankr. N.D. Ill.1998) (same); *Matter of Arnold*, 206 B.R. 560 (Bankr. N.D. Ala. 1997) (same); *In re Walker*, 180 B.R. 834 (Bankr. W.D. La. 1995) (same), *with In re Mariner Post-Acute Network*, 329 B.R. 481, 489-90 (Bankr. D. Del. 2005) (holding that Bankruptcy Code does not authorize punitive damages for violations of the discharge injunction); *In re Wagner*, 87 B.R. 612, 619 (Bankr. C.D. Cal. 1988) (same).

[12] The notice requirement has been met here by virtue of SMB's affirmative consent at the outset of the trial to the Court's consideration of punitive damages against SMB.

[13] *See In re Smith*, 212 Fed.Appx. 577, 578 (8th Cir. 2006) (citing *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 283-84 (9th Cir.1996)).

[14] *Id.* (citing *In re Ragar*, 3 F.3d 1174, 1178-79 (8th Cir.1993)). One distinction between criminal contempt and civil contempt is that sanctions for criminal contempt may be punitive, whereas sanctions for civil contempt may only be coercive.

[15] *Watkins*, 240 B.R. at 680 (quoting *Vazquez*, 221 B.R. at 231).

a reaffirmation agreement had never been signed.

Despite that knowledge, Young prepared and had the Debtor sign a new note for the full amount of the discharged debt, linking it to the same security agreement that had secured the original note. There is no evidence that Young consulted the bank's attorneys for guidance on how to handle the situation, or that he ever told Poindexter that he was not required to sign a new note in order to continue making the voluntary payments.[16] Then, within days of the Debtor's near-fatal stroke, Young prepared and had the Debtor's son sign a deed of trust granting the bank a security interest in the Debtor's home, thereby assuring that the bank would receive the net proceeds from the sale of the home.

Now, months later, Young has testified that he knew the deed of trust was invalid and that he would have had to release it had Poindexter refused to pay over the remaining sales proceeds to the bank. There is no good spin to be put on this testimony. Even if he had considered the deed of trust to be valid, as an experienced bank officer Young knew that he had locked up the net sales proceeds on the house and that it would be difficult for Poindexter to void the deed of trust if he decided not to pay the bank. On the other hand, if Young believed the deed of trust to be invalid from the beginning, he engaged in deception and trickery to make sure that SMB received more than $36,000 from the sale of Poindexter's home.

At the same time he was obtaining the deed of trust, Young was actively engaged in assisting the Debtor's children in selling their disabled father's house. He put the Debtor's children together with a remodeling contractor who could remodel the house and prepare it for sale, or who might buy it himself. Young himself was at the house when the contractor inspected the property and when the contractor and the Debtor's children agreed on an appropriate sales price. All of these actions took place within a matter of days after the Debtor had suffered a life-threatening stroke, yet there is no evidence that Young ever attempted to contact the Debtor and determine that his wishes were being followed.

In short, SMB did not simply *receive* voluntary payments from the Debtor on the discharged debt. It actively and affirmatively sought to *obtain* payment of a discharged and non-reaffirmed debt, all in violation of the discharge injunction of the Bankruptcy Code. The Court believes that

---

[16] The bank's trial counsel did not represent the bank in its prior dealings on the Poindexter notes.

an appropriate sanction for the bank's misconduct is 20 percent of the amount received by the bank from the sale of the Debtor's home, which is $7,235.19.

## CONCLUSION

Southwest Missouri Bank knowingly and willfully violated the provisions of the Bankruptcy Code in reaffirming a discharged debt with Robert Poindexter, a Chapter 7 debtor, and it knowingly and willfully violated the Bankruptcy Code's discharge injunction by taking affirmative steps to obtain payments from Robert Poindexter on that discharged debt. For the reasons stated above, the Court will award Robert Poindexter, the Debtor, actual damages of $36,175.95, attorney's fees and costs of $5,255.00, and punitive damages of $7,235.19.

A separate order consistent with this Memorandum Opinion shall be entered pursuant to Fed. R. Bankr. P. 9021.

**ENTERED** this 12th day of September 2007.

                                                  /s/    Jerry W. Venters
                                                United States Bankruptcy Judge

Copy of the foregoing mailed electronically or
conventionally to:
Norman E. Rouse
Robert L. Gross